**JUDGE FURMAN** UNITED STATES DISTRICT COURT **14 CV 4075**
SOUTHERN DISTRICT OF NEW YORK

BUDRI SRL,

                    Plaintiff,

        v.

CLARK CONSTRUCTION CORPORATION,

                    Defendant.

Civil Action No.

COMPLAINT AND DEMAND
FOR JURY TRIAL



RECEIVED
JUN 05 2014
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Budri Srl ("Budri"), by its counsel Golenbock Eiseman Assor Bell & Peskoe LLP, for its Complaint against defendant Clark Construction Corporation ("Clark"), alleges as follows:

### THE PARTIES

1.      Budri is an Italian business entity (societá a responsabilitá limitata), with its principal place of business at Via di Mezzo 65, 41037 Mirandola, Italy.

2.      Upon information and belief, Clark is a corporation organized under the laws of the State of New York, with its principal place of business at 99 University Place, New York, New York 10003.

### JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2), because Budri is a citizen of a foreign state and Clark is a citizen of the State of New York, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), because Clark resides in this district, and pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND

**The Original Contract between Budri and Clark**

5.      Budri is a leader in the business of designing, crafting and installing high-end marble and semi-precious stone for use in a wide variety of applications, including villas, residences, hotels and boutiques around the world.

6.      Budri has been in business for over 50 years.

7.      All of Budri's production, final testing and pre-assembly take place at Budri's plant in Italy to ensure the highest quality of each work.

8.      Budri's marble and semi-precious stone pieces are unique to each project and are works of art.

9.      Clark is in the business of residential construction management.

10.      Clark was retained by the owners (the "Owners") of a private residence in the Plaza Hotel, One Central Park South, New York, New York (the "Residence"), to be the construction manager for significant renovations to the Residence (the "Renovations").

11.      Upon information and belief, Clark retained Timothy Bryant Architect, PLLC ("TBAP") to be the architect for the Renovations.

12.      Upon information and belief, Clark designated TBAP as its agent in connection with the Renovations.

13.      In or about April 2011, TBAP, on behalf of Clark, issued a solicitation of bids for the marble work for the Renovations, which included several bathrooms (the "Project").

- 2 -

14.     TBAP thus held itself out, with Clark's knowledge and approval, as Clark's agent in connection with the design and pricing for the Project.

15.     The specifications for the marble work, at that time, provided for relatively simple designs and materials.

16.     Budri submitted a bid, and Clark awarded the Project to Budri.

17.     On December 21, 2011, Budri and Clark entered into a written contract (the "Original Contract").  A copy of the Original Contract is attached hereto as Exhibit A.

18.     As set forth in the Original Contract, Clark and Budri agreed to a price of $900,000 for the design, supply and installation of the marble.

19.     The Original Contract price was based on the relatively simple designs and materials set forth in the specifications.

20.     The Original Contract did not prohibit oral modifications.

**The Agreement between Budri and Clark for
More Elaborate Marble at an Increased Price**

21.     After the execution of the Original Contract, Budri began manufacturing the marble in accordance with the specifications under the Original Contract.

22.     However, after Budri had completed a significant amount of the marble, in or about May 2012, Clark informed Budri of a change to the specifications.

23.     The new specifications were for significantly more elaborate, complex and expensive marble designs and materials.

24.     As Clark and TBAP knew, Budri would no longer be able to use the marble that it had already produced pursuant to the original specifications.

25.     Clark and TBAP also knew that the new specifications would cost significantly more than the $900,000 price in the Original Contract.

26.     Clark, by its own words and conduct and by the words and conduct of its agent, TBAP, agreed to modifications to the Original Contract, pursuant to which Budri was to provide the more elaborate marble that Clark and TBAP requested, and Clark would pay Budri an increased price.

27.     Among other things, on or about July 24, 2012, TBAP, on behalf of Clark, approved the designs for the new marble in accordance with the new specifications by signing each of the new designs as "APPROVED."

28.     On or about July 25, 2012, Budri provided Clark with a document detailing an increase of $387,494.73 in the price for the marble under the new specifications as compared to the Original Contract price.

29.     Clark, by its own words and conduct and by the words and conduct of its agent, TBAP, agreed to that increased price and requested that Budri proceed with the Project under the new specifications and ship and install the more elaborate and expensive marble.

30.     On September 19, 2012, TBAP, on behalf of Clark, sent an email to Budri, copied to Clark, expressly referring to the "approved scheme" and the "approved package," without Clark or TBAP expressing any objection to the increased price that Budri had previously quoted.

31.     Similarly, on September 28, 2012, TBAP, on behalf of Clark, sent an email to Budri and Clark, concerning the finalization of the new design, and stating that Clark wanted to "go with" that new design.

32.     TBAP thus held itself out, with Clark's knowledge and approval, as Clark's agent in connection with reaching agreement on the new designs and materials at the increased price.

33.     In or about October 2012, at Clark's directive and with Clark's knowledge and approval, and without Clark (or anybody else) having expressed any objection to the increased

- 4 -

price that Budri had quoted, Budri began manufacturing the marble in accordance with the new specifications.

34.     On or about October 21 and 22, 2012, the Owners visited Budri's plant in Italy to inspect the new marble prior to shipment to the United States, and on or about October 25, 2012, Clark visited Budri's plant in Italy to do the same.

35.     During the plant visits, the Owners and Clark both saw and approved the significantly more elaborate and expensive marble, and neither of them expressed any objection to the increased price that Budri had quoted.  Instead, they requested that Budri go forward with the delivery and installation of the more elaborate and expensive marble.

36.     In November 2012, Budri began shipments of the marble to the United States and, over the next several months, installed the marble in the Residence.

37.     Clark accepted the delivery and installation of the marble with full knowledge that it was the significantly more elaborate and expensive marble that Budri had manufactured in accordance with the revised specifications that Clark and its agent had requested and approved.

38.     Between November 2012 and May 2013, Budri issued no less than eight invoices to Clark that reflected the increased price, and Clark made payments on those invoices without contesting them.

39.     Indeed, Clark affirmatively submitted Budri's invoices reflecting the increased price to clear the marble with Customs, thereby representing, pursuant to 19 U.S.C. § 1401a and 19 C.F.R. § 152.103, that the invoices accurately reflected the price of the goods.

40.     Based on the foregoing and other words and conduct of Clark and its agent, TBAP, Clark communicated its assent to the significantly more expensive marble and the increased price that Budri had quoted therefor.

- 5 -

41.     A contract was formed between Budri and Clark (the "Modified Contract") for the more elaborate marble at the increased price of $387,494.73 over and above the Original Contract price of $900,000.

### The Agreement Between Budri and Clark Concerning Responsibility for Customs Fees and Taxes

42.     Neither the Original Contract nor the Modified Contract included in the price, nor required Budri to be responsible for, customs fees and taxes for the importation of the marble.

43.     Prior to entering into the Original Contract and the Modified Contract, Budri expressly told Clark in writing, several times, that customs fees and taxes were not included.

44.     Clark agreed to the Original Contract and the Modified Contract without communicating any objection to Budri's express disclaimer of responsibility for customs fees and taxes.

45.     In November 2012, when Budri made a shipment of marble, Clark did not pay the customs fees and taxes for that shipment, thereby delaying the shipment at Customs and, in turn, risking the delay of the Project.

46.     As an accommodation to Clark and to avoid delaying the Project, Budri entered into an agreement with Clark, including through an exchange of emails between them, that Budri would advance the customs fees and taxes for that shipment and that Clark would reimburse Budri.   This agreement constituted a contract between Budri and Clark (the "Customs Contract").

47.     The amount of customs fees and taxes that Budri advanced, and for which Clark agreed to reimburse Budri, was $34,077.80.

- 6 -

**The Completion of the Project and Clark's
Failure to Pay Amounts Owing to Budri**

48.     In or about late October 2013, Budri completed the Project with the final installation of the more elaborate and expensive marble that had been requested, approved and accepted by Clark.

49.     Budri performed all of its obligations under the Original Contract as modified by the Modified Contract.

50.     Neither Clark, nor TBAP, nor the Owners have ever expressed any dissatisfaction with Budri's work.  To the contrary, they have praised Budri's work and acknowledged that Budri fully performed its obligations.

51.     However, Clark has breached its obligations to Budri by failing to pay amounts owing to Budri.

52.     To date, Clark has pad Budri only the amount of $765,284.36.

53.     Thus, without any colorable justification, Clark has failed to pay Budri even the $900,000 that Clark owes to Budri under the Original Contract.

54.     Clark also has failed to pay Budri any portion of the additional $387,494.73 agreed to in the Modified Contract over and above the original $900,000.

55.     Clark also has failed to pay Budri any portion of the $34,077.80 in customs fees and taxes advanced by Budri as an accommodation to Clark and for which Clark agreed to reimburse Budri.

56.     Budri and its counsel have repeatedly made demands to Clark, both orally and in writing, to pay the outstanding amounts owed to Budri, but Clark has refused.

57.     After Clark refused to pay the outstanding amounts to Budri, Budri learned that, although Clark approved the new designs for the more elaborate and expensive marble in the

2029506.2

summer of 2012 with knowledge of the increased price therefor, directed Budri to immediately commence production pursuant to the new specifications in order to fit within the timeline of the Renovations, accepted delivery and installation of the marble beginning in November 2012, and thereafter made payments on Budri's invoices reflecting the increased price and used those invoices to clear the marble at Customs without contesting those invoices, Clark apparently did not seek to renegotiate its own contract with the Owners to account for the increased price for the new marble until May 2013.

58.     The arrangement between Clark and the Owners has no bearing on Clark's obligations to Budri, because the Original Contract, the Modified Contract and Customs Contract were between Budri and Clark, were not conditioned on any approval by the Owners, and Budri never agreed to settle the matter of the additional costs or reimbursement of the customs fees and taxes directly with the Owners.

## COUNT 1:  BREACH OF CONTRACT

59.     Budri repeats and realleges the allegations of paragraphs 1 through 58 of this Complaint as if fully set forth herein.

60.     Budri entered into the Original Contract with Clark for a price of $900,000.

61.     Clark, by its own words and conduct and by the words and conduct of its agent, TBAP, agreed to the Modified Contract for the more elaborate and expensive marble at an increased price of $387,494.73 over and above the original price of $900,000.

62.     Budri has performed all obligations on its part in accordance with the Original Contract as modified by the Modified Contract.

63.     Clark breached the Original Contract by refusing to pay Budri the full $900,000 due thereunder, despite Budri's demands therefor.

64.     Clark breached the Modified Contract by refusing to pay Budri any portion of the additional $387,494.73 due thereunder, despite Budri's demands therefor.

65.     Budri and Clark also entered into the Customs Contract pursuant to which Budri agreed to advance, and Clark agreed to reimburse Budri for, $34,077.80 in customs fees and taxes for the importation of a shipment of the marble.

66.     Clark breached the Customs Contract by refusing to reimburse Budri for any portion of the $34,077.80 advanced by Budri, despite Budri's demands therefor.

67.     As a direct and proximate result of Clark's conduct, as alleged herein, Budri has been damaged in an amount to be proven at trial, but not less than $556,288.17.

### COUNT 2:  BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

68.     Budri repeats and realleges the allegations of paragraphs 1 through 67 of this Complaint as if fully set forth herein.

69.     The implied covenant of good faith and fair dealing was a term of the Original Contract, the Modified Contract, and the Customs Contract.

70.     Budri had a contractual expectation that, when Clark agreed to pay Budri the amounts owing under the Original Contract, the Modified Contract, and the Customs Contract, Clark would timely negotiate its arrangement with the Owners such that Clark would receive sufficient amounts from the Owners for Clark to be able to fulfill its obligations to Budri.

71.     Budri further had a contractual expectation that, if the Owners refused to re-negotiate their arrangement with Clark such that Clark would not have sufficient funds to fulfill its obligations to Budri, Clark would timely notify Budri.

72.     Clark breached its duty of good faith and fair dealing to Budri by failing to timely negotiate its arrangement with the Owners such that Clark would receive sufficient amounts

from the Owners for Clark to be able to fulfill its obligations to Budri and failing to timely notify Budri of any refusal by the Owners to include Budri's increased costs in the arrangement between the Owners and Clark, and further by approving the new specifications for the more elaborate and expensive marble with knowledge of the increased price therefor, directing Budri to produce the more elaborate marble, and accepting the delivery and installation of the more elaborate marble, while refusing to pay Budri the increased price therefor.

73.    Clark's conduct as alleged herein denied Budri of the benefit of the bargain intended by Clark and Budri and, further, caused Budri to expend significant time, resources, and costs for which Budri has not been compensated.

74.    As a direct and proximate result of Clark's conduct, as alleged herein, Budri has been damaged in an amount to be proven at trial, but not less than $556,288.17.

### COUNT 3:  UNJUST ENRICHMENT

75.    Budri repeats and realleges the allegations of paragraphs 1 through 74 of this Complaint as if fully set forth herein.

76.    In the alternative, to the extent it were determined that there was not a contract between Budri and Clark for the more elaborate marble at the increased price or for the reimbursement of the customs fees and taxes advanced by Budri, Clark has been unjustly enriched at the expense of Budri, and it is contrary to equity and good conscience for Clark to retain such enrichment without compensating Budri.

77.    At Clark's request and with Clark's knowledge and approval, and after Budri was asked to scrap the marble initially requested under the Original Contract, Budri provided valuable goods and services to Clark well in excess of those contemplated by the Original Contract, requiring the expenditure of significant time, resources, and costs by Budri, including,

2029506.2

without limitation, the design, manufacture, and installation of significantly more elaborate and expensive marble and the advancement of the custom fees and taxes.

78.     Clark knowingly accepted the benefits of Budri's extra goods and services with knowledge of the significant expenditures of time, resources, and costs that the provision of those extra goods and services imposed on Budri, but Clark has not compensated Budri for any portion of the additional goods and services, let alone for the full amount owing under the Original Contract.

79.     Had Budri known that Clark would not pay the increased price for the more elaborate and expensive marble that Clark had requested, Budri would have proceeded with the original marble design or stopped work and demanded performance under the Original Contract.

80.     Clark should be required to disgorge the amount of its unjust enrichment and pay it to Budri, together with the amount owing by Clark under the Original Contract, in an amount to be determined at trial, but not less than $556,288.17.

## COUNT 4:  QUANTUM MERUIT

81.     Budri repeats and realleges the allegations of paragraphs 1 through 80 of this Complaint as if fully set forth herein.

82.     At Clark's request, Budri provided valuable goods and services for the benefit of Clark, over and above the value of the goods and services contemplated under the Original Contract, including, without limitation, the design, manufacture, and installation of significantly more elaborate and expensive marble and the advancement of the custom fees and taxes.

83.     Clark accepted and benefited from the additional goods and services provided by Budri, knowing that the value of such goods and services exceeded the price agreed to under the Original Contract and that the provision of such additional goods and services required Budri's

expenditure of significant additional time, resources, and costs, but Clark has refused to compensate Budri for the reasonable value thereof, let alone pay the full amount owing under the Original Contract.

84.     Budri justifiably expected a reasonable amount of compensation for the extra goods and services it provided to Clark, including, without limitation, because Clark requested, approved, and accepted such additional goods and services with knowledge of the increased price therefor.

85.     Budri is entitled to recover from Clark the reasonable value of the additional goods and services it provided to Clark, together with the amount owing by Clark under the Original Contract, in an amount to be determined at trial, but not less than $556,288.17.

## COUNT 5:  EQUITABLE ESTOPPEL

86.     Budri repeats and realleges the allegations of paragraphs 1 through 85 of this Complaint as if fully set forth herein.

87.     Clark and its agent, TBAP, engaged in conduct that conveyed -- and was calculated to convey -- the impression to Budri that the more elaborate and expensive marble and the increased price therefor had been approved by Clark, TBAP, and the Owners, including, without limitation, by communicating to Budri that the new designs were "approved" after Budri had advised Clark and TBAP of the increased price therefor, instructing Budri to cease manufacturing the original marble and commence manufacturing the more elaborate and expensive marble, visiting Budri's plant and approving the more elaborate and expensive marble, making payments on invoices that reflected the increased price and using such invoices to clear the marble at customs without contesting the amounts of the invoices, and accepting the delivery and installation of the more elaborate and expensive marble.

2029506.2

88.     Clark intended that Budri would act in reliance upon the aforementioned conduct by designing, manufacturing, delivering and installing the more elaborate and expensive marble and by advancing the customs fees and charges, and Budri did so justifiably rely.

89.     During the time of Clark's conduct as alleged herein and the reasonable reliance by Budri thereon, Clark knew, but did not disclose to Budri, that Clark had not timely sought to renegotiate its own contract with the Owners to account for the increased price of the more elaborate and expensive marble and the customs fees and taxes such that Clark would have sufficient funds to pay the extra amounts to Budri.  Instead, Clark attempted to make it seem that it belatedly asked the Owners to pay the increased price as a favor to Budri.

90.     By reason of the conduct alleged herein, which induced the reasonable reliance of Budri thereon, Clark is estopped from disclaiming its obligation to pay Budri the increased price for the more elaborate and expensive marble and the cost of the customs fees and taxes advanced by Budri, together with the amount owing by Clark under the Original Contract, in an amount to be determined at trial, but not less than $556,288.17.

## COUNT 6:  ACCOUNT STATED

91.     Budri repeats and realleges the allegations of paragraphs 1 through 90 of this Complaint as if fully set forth herein.

92.     Beginning in November 2012 and continuing for several months thereafter, including through July 2013, Budri sent numerous invoices to Clark that reflected the increased price, identified the more elaborate and expensive marble pursuant to the new specifications, and identified Clark as the recipient of the marble and the holder of the invoices.

2029506.2

93.     Clark received and retained the aforementioned invoices without objecting to them within a reasonable time.  To the contrary, Clark made payments on no less than eight invoices between November 2012 and May 2013 without contesting the invoices.

94.     Additionally, Clark affirmatively submitted Budri's invoices reflecting the increased price to clear the marble with Customs, thereby representing to Customs in accordance with 19 U.S.C. § 1401a and 19 C.F.R. § 152.103 that the invoices reflected the actual, agreed price of the goods.

95.     During that time period from November 2012 through July 2013, Clark accepted Budri's delivery and installation of the more elaborate and expensive marble reflected in the invoices.

96.     It was not until July 2013, at the earliest, that Clark informed Budri that Clark allegedly was involved in a disagreement with the Owners over the re-negotiation of Clark's own contract with the Owners.  Even at that time, Clark did not contest the accuracy of the invoices, but rather attempted to justify its non-payment by shifting the blame for such non-payment to the Owners, notwithstanding that Clark's own belated efforts at re-negotiation with the Owners had no bearing on Clark's obligations to Budri.

97.     By reason of the conduct alleged herein, Clark accepted the invoices as correct and is bound to pay the amounts reflected therein, and thus Budri is entitled to damages in the amount of the increased price, together with the amount owing by Clark under the Original Contract and under the Customs Contract, in an amount to be determined at trial, but not less than $556,288.17.

## **PRAYER FOR RELIEF**

WHEREFORE, Budri respectfully requests that this Court enter judgment in favor of Budri and against Clark in an amount to be determined at trial, but for not less than $556,288.17, in addition to statutory interest thereon, the attorneys' fees and costs incurred by Budri in this action, and such other and further relief as the Court may deem just and proper.

Dated: New York, New York
      June 5, 2014

GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP

By: _____
      Martin S. Hyman (MH4131)

Matthew C. Daly (MD8488)
437 Madison Avenue, 35th Floor
New York, New York 10022
(212) 907-7300
mhyman@golenbock.com
mdaly@golenbock.com

*Attorneys for Plaintiff Budri Srl*

2029506.2

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff Budri Srl demands a trial by jury on all issues properly triable by a jury.

Dated: New York, New York
      June 5, 2014

GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP

By: _____
      Martin S. Hyman (MH4131)

Matthew C. Daly (MD8488)
437 Madison Avenue, 35th Floor
New York, New York 10022
(212) 907-7300
mhyman@golenbock.com
mdaly@golenbock.com

*Attorneys for Plaintiff Budri Srl*

- 16 -

2029506.2

# EXHIBIT A

# CLARK CONSTRUCTION CORPORATION

99 University Place New York, New York 10003

**WORK ORDER #** | **280-025**

Tel: (212) 219-1783 Fax: (212) 226-2521

| | |
|---|---|
| **JOB NO:** 280 | **DATE:** 12.21.11 |
| **NAME:** Private Residence | |
| **ADDRESS:** 1 Central Park South | |
| **FLOOR OR ROOM:** 1007 - 1009 | |

☐ CHANGE ORDERS    ☐ BACK CHARGES    ☑ CONTRACT    ☐ CONTRACT EXTRA
(estimating error)

| Stone Contract Complete | | Contract Budget or Change Order |
|---|---|---|
| Furnish & Install Onyx patterned floors and decorative wall panels as per | | |
| Constructon documents, field inspection and Client directive. | | |
| Inclusive of: | | |
| Field measure | | |
| Detailed shop drawings | | |
| Renderings, mockups as required | | |
| Compliance with the project schedule | | |
| Furnish & install specified sound attenuation and waterproofing as specified | | |
| Install (only) electric heat mat in conjunction with electrician | | |
| *and* | | |
| As per Budri Proposal received 12.12.11 | $ 900,000.00 | |
| | | |
| | | |
| | | |
| | | |
| | | $900,000.00 |

**FIRM PRICE:** $900,000.00    **NTX:** [          ]    **T & M:** [          ]

PREPARED BY: TM

COMPANY: Budri

ACCEPTED

AUTHORIZED BY:

## SUBCONTRACTOR

| TRADE | SUBS # MEN | SUBS # HRS | O.T. | COMPANY | SUB-BILLING | CHANGE ORDER |
|---|---|---|---|---|---|---|
| Stone | | | | Budri | $900,000.00 | $0.00 |
| | | | | | | |
| | | | | | **SUB-TOTAL** | $0.00 |
| | | | | | **Insurance** | $0.00 |
| | | | | | **Fees** | $0.00 |
| Explanation for B.C. or C.E. | | | | | | |
| | | | | | **TOTAL** | $0.00 |

cc: Accounting, Estimating

The subcontractor(s) named above agrees to indemnify CLARK CONSTRUCTION CORPORATION, the Property Owner, the Architect and their respective directors, officers and employees,and hold harmless from and against all claims, damages, losses and expenses, including but not limited to attorney's fees arising out of such claim, damage, loss or expense attributable to bodily injury, sickness, disease or death, or to injury or destruction of tangible property (other than the work itself) including resulting loss of use. The subcontractor further acknowledges their obligation to comply with all applicable DOB & OSHA safety regulations, to provide competent persons capable of supervising and executing the work in a safe and lawful manner, to provide adequate safety training, equipment and certifications for all employees entering the job site as required by applicable governing agencies and by this agreement assures the Contractor that they are familiar with all regulations relevant to their contracted scope of work.  The subcontractor shall not proceed with any work if a condition is assessed as unsafe and shall immediately notify the Contractor of any such conditions. Any penalties assessed upon the Contractor resultant of the subcontractor's negligence, inadequate supervision / training or failure to comply with any applicable regulatory agency shall be borne by the subcontractor.  The subcontractor agrees that this covenant shall extend to the subcontractor's employees, vendors, suppliers and subcontractors

**VESTIBULE BAR 101**

Countertop: Furnish, fabricate, install and seal 1-1/4" Cream colored stone [TBD]; shaved to 1" with carved ornamentations on profiled edge

**KITCHENETTE 105**

Countertops: Furnish, fabricate, install and seal 1-1/4" Calacatta or EQ. [Polished] with one rectangular undermount sink cut out and profiled ed

Backsplash / Sidesplash: Furnish, fabricate, install and seal 1-1/4" Calacatta or EQ. [Polished] bookmatched to countertops with contoured profi

**POWDER ROOM 1 109**

Soundproofing: Furnish and install ECORE Qtscu #4010

Floor Preparation: Furnish and install 1-1/4" cement on the floor -- Note: Includes mud setting electric radiant heat mat

Waterproofing: Furnish and install Laticrete # 9235 on the floor, extend 6" up the walls

Floor: Furnish, fabricate, install and seal 3/4" custom waterjet wind rose pattern mosaic floor with 6" ornamental border (based upon Lotus Onyx

Base Panels (Field only): Furnish, fabricate, install and seal 3/4" stone panels (based upon Lotus Onyx and Rosa Aurora)

Vanity Upper Walls: Furnish, fabricate, install and seal 3/4" stone panels (based upon Lotus Onyx and Rosa Aurora) with carved ornamentation

Vanity Top: Furnish, fabricate, install and seal 3/4" stone (based upon Lotus Onyx and Rosa Aurora) with one oval undermount sink cut out and

Saddle: Furnish, fabricate, install and seal 3/4" stone (based upon Lotus Onyx and Rosa Aurora0

**MASTER BATHROOM 115**

Master Bathroom #115 Soundproofing: Furnish and install ECORE Qtscu #4010

Floor Preparation: Furnish and install 1-1/4" cement on the floor with shower area sloped to the drain -- Note: Includes mud setting electric radia

Waterproofing: Furnish and install Laticrete # 9235 on the floor, extend 6" up the walls, full height tub walls and shower walls including the ceilin

Main Floor: Furnish, fabricate, install and seal 3/4" multi-specie custom waterjet floral mosaic floor with 6" ornamental border (based upon Pink (

Vestibule Floor: Furnish, fabricate, install and seal 3/4" multi-specie custom waterjet floral mosaic floor with 6" ornamental border (based upon P

WC Floor: Furnish, fabricate, install and seal 3/4" multi-specie custom waterjet floral mosaic floor with 6" ornamental border (based upon Pink &

Shower Floor: Furnish, fabricate, install and seal 3/4" Pink Onyx [High Honed]; ground around the drain for sloping

Shower Curb: Furnish, fabricate, install and seal 3/4" Pink Onyx [Polished]; 4-1/2" wide with eased edge

Shower Jambs/Header: Furnish, fabricate, install and seal 3/4" Pink Onyx [Polished]; 4-1/2" wide with eased edge

Shower Walls: Furnish, fabricate, install and seal 3/4" Pink Onyx [Polished] stiles, rails and inset panels

Shower Ceiling: Furnish, fabricate, install and seal 3/4" Pink Onyx [Polished]

WC Walls: Furnish, fabricate, install and seal 3/4" Pink Onyx [Polished] with recessed panel assembly and carved ornamentations at upper pane

WC Base: Furnish, fabricate, install and seal 3/4" Pink Onyx [Polished]; 6" high with profiled edge

Main Walls: Furnish, fabricate, install and seal 3/4" Pink Onyx [Polished] with recessed panel assembly and carved ornamentations at upper par

Main Base: Furnish, fabricate, install and seal 3/4" Pink Onyx [Polished]; 6" high with profiled edge

Tub Deck: Furnish, fabricate, install and seal 3/4" Pink Onyx [Polished] with custom tub cut out ground around opening and built-up custom profi

Tub Apron: Furnish, fabricate, install and seal 3/4" Pink Onyx [Polished] with recessed panel set and profiled edge - - Note: due to overall length

1

| | | | |
|---|---|---|---|
| Vanity Top: Furnish, fabricate, install and seal 3/4" Pink Onyx [Polished] with oval undermount sink cut out and built-up contoured, profiled edge | | | |
| Saddle: Furnish, fabricate, install and seal 3/4" Pink Onyx [Polished] | | | |
| Material selection note: - per Addendum #1 note 6 - "Field of the upper panels to be of lighter Pink Onyx than stiles & rails, in order to create sut | | | |
| **POWDER ROOM 2 116** | | | |
| Powder Room II #116 Soundproofing: Furnish and install ECORE Qtscu #4010 | | | |
| Floor Preparation: Furnish and install 1-1/4" cement on the floor -- Note: includes mud setting electric radiant heat mat | | | |
| Waterproofing: Furnish and install Laticrete # 9235 on the floor, extend 6" up the walls | | | |
| Floor: Furnish, fabricate, install and seal 3/4" custom waterjet floral pattern mosaic floor with 6" ornamental border (based upon Rojo Alicante an | | | |
| Wall Inclay Panels: Furnish, fabricate, install and seal 3/4" Rojo Alicante [Polished] | | | |
| Vanity Top: Furnish, fabricate, install and seal 1-1/4" Rojo Alicante [Polished] with one oval undermount sink cut out and contoured profiled edge | | | |
| Backsplash: Furnish, fabricate, install and seal 3/4" Rojo Alicante [Polished]; 4-5/8" high with contoured, profiled edge | | | |
| **BATHROOM 1 121** | | | |
| Soundproofing: Furnish and install ECORE Qtscu #4010 | | | |
| Floor Preparation: Furnish and install 1-1/4" cement on the floor -- Note: includes mud setting electric radiant heat mat | | | |
| Waterproofing: Furnish and install Laticrete # 9235 on the floor, extend 6" up the walls, full height tub walls including the deck | | | |
| Floor: Furnish, fabricate, install and seal 3/4" multi-specie custom waterjet floral mosaic floor with 6" ornamental band (based upon Green & Hor | | | |
| Wainscot/Cap: Furnish, fabricate, install and seal 3/4" Green Onyx [Polished] with recessed panel assembly and carved ornamentation includin | | | |
| Base: Painted wood furnished and installed by others | | | |
| Tub Walls: Furnish, fabricate, install and seal 3/4" Green Onyx [Polished] with recessed panel assembly and carved ornamentation | | | |
| Tub Niche: Furnish, fabricate, install and seal 3/4" Green Onyx [Polished] with eased edge and one stone shelf | | | |
| Tub Deck: Furnish, fabricate, install and seal 3/4" Green Onyx [Polished] with standard tub cut out and built-up custom profiled edge | | | |
| Tub Apron/Base: Painted/gilded wood by others | | | |
| Vanity Top: Furnish, fabricate, install and seal 3/4" Green Onyx [Polished] with oval undermount sink cut out and built-up contoured, profiled edg | | | |
| Saddle: Furnish, fabricate, install and seal 3/4" Green Onyx [Polished] | | | |
| **BATHROOM 2 116** | | | |
| Soundproofing: Furnish and install ECORE Qtscu #4010 | | | |
| Floor Preparation: Furnish and install 1-1/4" cement on the floor with shower area sloped to the drain -- Note: includes mud setting electric radia | | | |
| Waterproofing: Furnish and install Laticrete # 9235 on the floor, extend 6" up the walls, full height tub walls and shower walls including the ceilin | | | |
| Main Floor: Furnish, fabricate, install and seal 3/4" multi-specie custom waterjet floral mosaic floor (based upon Rosa Aurora) | | | |
| Shower Floor: Furnish, fabricate, install and seal 3/4" Rosa Aurora [Honed]; ground around the drain for sloping | | | |
| Shower Curb: Furnish, fabricate, install and seal 3/4" Rosa Aurora [Polished]; 5-1/2" wide with eased edge | | | |
| Shower Jambs/Header: Furnish, fabricate, install and seal 3/4" Rosa Aurora [Polished]; 5-1/2" wide with eased edge | | | |

| | | |
|---|---|---|
| Shower Walls: Furnish, fabricate, install and seal 3/4" Rosa Aurora [Polished] flush panel assembly | | |
| Shower Ceiling: Furnish, fabricate, install and seal 3/4" Rosa Aurora [Polished] | | |
| Tub Deck: Furnish, fabricate, install and seal 1-1/4" Rosa Aurora [Polished] with standard tub cut out and custom profiled edge | | |
| Tub Apron: Furnish, fabricate, install and seal 1-1/4" Rosa Aurora [Polished] with recessed panel | | |
| Tub Walls: Furnish, fabricate, install and seal 3/4" Rosa Aurora [Polished] with 3" wide stiles, rails and inset panels with carved ornamentation | | |
| Tub Ceiling: ornamental plaster by others | | |
| Other Walls: Furnish, fabricate, install and seal 3/4" Rosa Aurora [Polished] with 3" wide stiles, rails and inset panels with carved ornamentation | | |
| Window Sill/Surround: painted wood by others | | |
| Vanity Top: Furnish, fabricate, install and seal 1-1/4" Rosa Aurora [Polished] with one oval undermount sink cut out and contoured, profiled edge | | |
| Backsplash: Furnish, fabricate, install and seal 3/4" Rosa Aurora [Polished]; 5-1/2" high with profiled edge | | |
| Backsplash: Furnish, fabricate, install and seal 3/4" Rosa Aurora [Polished]; 5-1/2" high with profiled edge | | |
| Saddle: Furnish, fabricate, install and seal 3/4" Rosa Aurora [Polished] | | |
| | | |
| | | |

3